219-0974 W.C. St. Charles Community School District No. 303 Appellant v. The Workers' Compensation Commission Eileen Budsman-Appley. Okay, Ms. Thomas, can you hear us okay? Yes. Very good. You may proceed. Okay. May it please the Court, Counsel, my name is Kristen Thomas on behalf of the Appellant Plaintiff, St. Charles Consolidated Unit School District 303, and the Plaintiff's moves this Honorable Court to reverse the decision of the Circuit Court below, which had affirmed the Commission majority, and to enter a decision consistent with that of dissenting Commissioner Simpson. The Plaintiff argued that, or Plaintiff argues that the Commission's award of permanent partial benefits and temporary total disability benefits awarded was excessive and against the manifest weight of the evidence. First, I'll discuss the Commission's findings and conclusions regarding the degree of permanent partial disability sustained by the defendant as a result of her fall were not supported by the record and are against the manifest weight of the evidence. When the majority of the Commission gave their decision, they simply affirmed and adopted the arbitrator's decision and did not specifically comment on any of the arbitrator's findings or conclusions. Therefore, we'd like to specifically comment on the arbitrator's finding and conclusions. Do they have to do that? No, they don't have to. But I think in order to provide a thorough record, or in this case, there was a lot of medical nuances that the Plaintiff thinks that the findings of Commissioner Simpson, who actually went through the record and noticed all of the issues and noted them in her decision was more thorough than simply affirming and adopting. That's a conclusion that could be argued. If you adopt findings of the arbitrator, you look to the arbitrator's findings and discuss those. Yes, that's true. Just because someone disagrees with an arbitrator's conclusion, naturally, they would probably look for support for that disagreement and would be looking at the record very thoroughly in support of things to support a different conclusion. I don't think you can say one did not look at the record's findings or one looked at it more carefully. Ms. Thomas, there's no question as I understand that the petitioner was injured in the accident where she fell on the ice and struck her head. That's not in dispute, correct? No, that's not in dispute. The nature and the extent of all of this treatment and the extent of her injuries, it really is where the controversy comes in, correct? That's correct. Okay, and the claimant, did she not have a couple of doctors that testified that there was a causal connection that the work injury did cause the condition of ill-being that she's suffering from? So she had that on her side, correct? She, yes, there were a couple. And then I think that the problem also enters that she had a psychiatric condition that a couple of doctors also indicated were not related to the work accident. So that's, I guess, one of the reasons for the appeal as well and why we believe that the plaintiff's IME doctor indicated that she was at MMI back in June or August of 2011. And then she continued to have other psychological issues after that. Let me ask you about that. Is there any issue that the claimant is suffering from some type of a psychiatric issue or disorder? I believe there is some type of psychological disorder, but the issue is that it's, we're arguing that it's not related to her work accident and was... If it was, there is a body of law, is there not, that says a psychological injury would be compensable if in fact it results from the accident, correct? That's correct, but we don't believe that... Why is that not the case in here? Pardon? Why is that not the case here? Because we believe that she had a simple concussion and that it resolved back in... Her concussion and her cervical sprain had resolved back in August 2011, which is also when we believe that the TTD benefits should have been terminated. What is your evidence or testimony that establishes that? The IME physician testified to that. Dr. Skletsky indicated that she had reached MMI back in August 2011. Also, the treating physician, Dr. Flaster indicated in May of 2011 that her complaints had changed and that he could not offer her any additional care. She continued to have negative neurological findings throughout this entire time. I think that's when it shifted into this psychological issue. Was there anyone to say that there is a connectivity between this psychological condition and the incident that occurred when she fell and suffered a concussion? I believe that Dr. Skletsky said that the psychological condition in his IME, his three IMEs, well, especially his last one, indicated that the psychological condition wasn't related. Well, is there a Dr. Syad involved in this examination and opinion? Yes, that was. Yes, she examined the petitioner. And what did she conclude? That he had, or that she had, well, that her condition was related to the accident. Okay, and who weighs those various opinions? The court, the arbitrator. Okay, is there something, some reason that it was a misalignment of one versus the other? Well, I think the problem is that her, two of her treating doctors received a inaccurate description of the injury. And it goes back to whether or not she lost consciousness for 45 minutes at the time of the injury. And both Dr. and Syad indicated, and Dr. Boblink indicated that the petitioner never told her that she did not lose consciousness. So that's why we think that it's important that when you're not told an accurate description of your injury or condition at the time that it would happen, that that's going to ultimately affect whether or not it is actually related to the work accident. Was there any definitive evidence presented? Is there any evidence that the loss of or not losing consciousness creates a different outcome? Well, I think Dr. Syad and Dr. Boblink both said that it was important whether she lost consciousness or not. And ultimately, I think what, I guess the diagnosis as related to the actual work accident could potentially be different. It would appear to be a factor according to the doctors. But my question is, was there any evidence presented that definitively established whether she did or didn't lose consciousness? Well, the treating medical records at the emergency room from Del Nor Hospital, those were admitted into evidence by plaintiff. And those clearly indicate that she denied losing consciousness and denied any amnesia. And then after that point, defendant went on to indicate that she inserted reporting to her doctors after that, that she did lose consciousness. So it's basically her testimony versus what's actually in the initial emergency records from the date of accident. Well, there is a plausible explanation, is there not, as to why it would not have been potentially recalled in the emergency room, but later learned that from coworkers that the claimant had actually lost consciousness? There could be, but she never denied saying that she did not lose consciousness in those records at the testimony at arbitration. Um, I suppose my observation is that the commission had two theories. Uh, it could weigh and determine whether or not she did lose consciousness. There was an explanation for why it is she may not have stated that she knew that she lost consciousness when in the emergency room. That's, that's possible. Yeah. Yes. Ms. Thomas, wasn't there evidence that she laid in the same place that she fell for like 45 minutes? That's what the defendant testified to at trial. But as far as there's no other evidence outside of her testimony. Can I ask you a question? The arbitrator and the commission awarded 40% of a person as a whole. You suggest it should be 10%. How'd you get to the 10%? Um, we are using what was recommended in commissioner Simpson's descent. And what does it say in there, how he arrived at that number? Um, she arrived at the number because she also did not believe that the petitioner suffered from a, or continued to suffer from a post concussion syndrome. Commissioner Simpson believed that she had a mild concussion and cervical sprain, and that's what she based her 10% man as a whole award on. Okay. And I'm going to jump to the question of the temporary total disability benefits. Um, uh, again, we're relying on commissioner Simpson's descent and she recommended that we pay only temporary total disability benefits until August 4th, 2011. And that number or date was, was determined based on the IME opinion from Dr. Uh, the petitioner had her last IME on June 21st, 2011. And at that time, Dr. Skoletsky had recommended that the petitioner undergo six additional weeks of therapy or work conditioning for her cervical strain. The defendant never underwent that recommended treatment. And when we, when we took the deposition of Dr. Skoletsky, he indicated at the time that he saw her on June 21st, 2011, that the petitioner's concussion symptoms had resolved and that he was only recommending the six weeks of physical therapy, um, for the cervical strain. And that even if the petitioner chose not to, or excuse me, even if the defendant chose not to undergo that therapy, that she was still able to return to work at that time. And he was recommending the therapy, uh, because she had become so sedentary from the date of the accident. So again, plaintiff is recommending that, uh, you find that the defendant's period of And I guess with that, unless there's any additional question after reviewing all of the evidence, we think that the commission erroneously found that defendant proved her work accident and not her other mental health issues. And we moved the court to reverse the decision of the circuit court below, uh, which had affirmed and affirm the commission majority opinion. And we further ask that you enter a decision that is consistent with the dissenting opinion of commissioner Simpson, which is for 10% loss of person as a whole for the mild concussion and cervical sprain, as well as terminate temporary total disability benefits on August 4th, 2011. Okay. Thank you. Counsel. You'll have time and reply. Okay. Thanks. Shaddy. You may, uh, respond. Oops. Oops. Oops. Oops. Uh, there, there we go. Unmute area. I'll get used to this someday. You justice. May it please the court. Good afternoon. Justices and counsel. I'm Dave Manchetti and I represent the injured worker. Eileen Budspan in this matter. It is undisputed that Ms. Budspan sustained accidental injuries that arose out of it in the course of her employment as a bus driver on December 6th, 2010. It's virtually undisputed that Ms. Budspan sustained a cerebral concussion at that time. Emergency room says that she sustained an acute closed head injury. Dr. Boblic and Dr. Bonesteel say that she has post-concussion syndrome. Dr. Shank says that she has post-concussion syndrome and that might be the trigger for some of her symptoms. Dr. Walsh talks about post-concussion syndrome as does Dr. Kata. Most importantly, as it relates to these treating doctors, Dr. Walsh, who is a brain injury expert and who was deposed and subject to cross-examination said that Ms. Budspan suffered from post-concussion syndrome. In fact, even the employer's own chosen medical witness, Dr. Skaletsky agrees that Ms. Budspan sustained a concussion. It is also undisputed that as a result of her case, Ms. Budspan was required to miss a significant amount of time from work and was temporarily and totally disabled for some significant period of time. Let me interject a question, if I could ask you a question, and I think Ms. Thomas alluded to this. Along the process of treatment and care, there had to be some neurological and cognitive tests that were administered to the claimant, correct? Correct. Did those tests all yield normal results? The test results within normal ranges. That's correct. So to Ms. Thomas's point, were there any objective findings to support the practitioner's subjective complaints? The objective findings that were clinically demonstrated by Dr. Boblik and Dr. Syed. So yes, when a doctor says, or like Dr. Syed, who is a brain injury expert, notes findings that are consistent with post-traumatic, or I'm sorry, post-concussion syndrome, then those are objective. But they were not based on neurological and cognitive tests, as you just indicated, correct? That's correct. Okay. Experts like Dr. Syed takes a look at the totality of the circumstances, and she finds that all through the course of her treatment, that Ms. Budsman is continuing to suffer from the effects of a post-concussion syndrome, which is exactly the same diagnosis that the employer's own medical witness endorsed. Dr. Skoletsky says that she has a concussion. We're not arguing about whether she has a concussion, according to the employer in this case. We're arguing about what is the extent of that injury? What is the degree, as the employer calls it, of that injury? Either way, it's undisputed that Ms. Budsman has some permanent injury as a result of these accidental injuries. For example, as counsel has already mentioned, even the dissenting commissioner agreed that Ms. Budsman has some degree of permanent injury. It's not a matter of whether she has permanent injury, it's a matter of what is the extent of that permanent injury. There seems to be some issue or dispute over whether or not she lost consciousness at some point. Is that a significant issue to you? It is not a significant issue, and I'll tell you why in just a second. But I'd like to just remind you of the disputed nature of this issue of whether she lost consciousness or not. The employer's argument in this case comes down to one line of one note on one page of one medical record, and a record that includes hundreds and hundreds of pages of medical notes, including pre-evidence depositions of doctors who all agree that Ms. Budsman suffered a concussion. The employer asserts that there is an inconsistent history in that emergency room record, that Ms. Budsman did not, quote unquote, a loss of consciousness. When questioned, Ms. Budsman did not recall giving that history. She didn't deny it, as counsel has already said, but she didn't endorse it either. And I could read to you what she said. Question, do you remember if they asked you whether or not you had lost consciousness from this event this fall? Answer, I don't remember. I'm very sorry, sir. And even that one solitary note is ambiguous in and of itself, considering the circumstances. The employer says that Ms. Budsman, quote unquote, reported no loss of consciousness or denied a loss of consciousness. In fact, the record does not talk about her report at all. It simply concludes that she had no loss of consciousness. The emergency room history does not, in fact, say that Ms. Budsman did not have a loss of consciousness. It does not say where that report came from. Ms. Budsman does not recall giving that report. When that very same ER note wants to record what Ms. Budsman actually stated herself in the emergency room, it says so explicitly, quote, we state that after the fall, we wanted to go to sleep, close quote, which considering the circumstances might have been her way of saying that she had suffered some alteration in her consciousness. And despite all that, even without the loss of consciousness, the emergency room diagnosed her as having an acute closed head injury. The arbitrator and therefore the commission, which affirmed and adopted the arbitrator's findings, concluded that Ms. Budsman did, in fact, suffer a loss of consciousness at the time of the fall. On what evidence did the arbitrator base that decision? She hit her head very hard. Everything went black. She felt like falling asleep. She was discovered only after some time went by. She missed her bus route on that day. Paramedics were called to the scene. She was discovered lying down on icy pavement. At the ER, she was asking repetitive questions, which in and of itself is an indication of mental confusion and an alteration in her consciousness. After the emergency room, there were consistent reports of loss of consciousness from multiple doctors. She's consistently been diagnosed with a concussion. That's the evidence that supports the arbitrator and commission's finding that she lost consciousness. I have a question. This loss of consciousness, would it be naive to ask, so what? Whether it occurred or didn't occur? Does a concussion have to have loss of consciousness to suffer a concussion? So the answer to the question, so what, I think is not much. And here's what I mean by that. Even if she had not lost consciousness, it does not matter as much as the employer would want you to believe. And that's because you can have a concussion and symptoms of a concussion without loss of consciousness. How do we know that? The employer's own doctor tells us so. When asked to describe what a concussion is, Dr. Scheletzi, the employer's own hand chosen medical witness said, and I quote, Question, okay, describe to the arbitrator in layman's terms, what is a concussion? Answer, a concussion is defined as a temporary loss of neurologic. It does not require loss of consciousness. This is the employer's expert. It does not require loss of consciousness. But if there is some retrograde amnesia, if there is unsteadiness, if there is difficulty with alertness or concentration, that can be a part of concussion syndrome, even if they were not unconscious. And of course, these medical records are replete with Ms. Budspan having symptoms of retrograde amnesia, unsteadiness, difficulty with alertness or concentration. That's the employer's very own medical expert stating that. Regarding the manifest weight of the evidence question, I know that I don't have to hammer this home, but I'm going to try to do a little bit of that anyway. The employer is asking you to do what it knows you cannot do, which is to somehow calibrate or adjust the commission's. You cannot do this because of the manifest weight of the evidence standard. You can't do this because we all know that it's the commission's sole prerogative to determine the extent of these types of awards. You cannot do this because you cannot substitute your own judgment of the commission on these highly factual issues. In the final analysis, Ms. Budspan's credibility was personally and explicitly judged by the commission based on the arbitrator's findings. She was found to be credible, especially on credibility issues. This court must be careful not to substitute its judgment for the judgment of the arbitrator and the commission. The counsel herself has called this a case of medical nuance, and she's absolutely right. This is a case of medical nuance. The commission decided those issues of medical nuance in favor of Ms. Budspan and based on the manifest weight of the evidence. Therefore, in conclusion, based on the manifest weight of the evidence, Eileen Budspan respectfully requests that this court affirm the circuit court order, which confirmed the commission decision. Thank you, Mr. Minchetti. Ms. Thomas, you may reply. Turn on your audio. There we go. Hopefully. Turn on your audio. There we go. I just think that we need to reiterate the fact that throughout this entire period, the defendant had no neurological findings. All of her MRIs, everything was negative, which would attest to the fact that she had a mild concussion and the permanency as recommended by Commissioner Simpson would be more in line with this mild concussion and cervical strain. What about the idea that somehow, whether or not there was a period of unconsciousness that this injury triggered the scenario to where we have a claimant who is less well than they were before the accident? Well, I think the issue is, did she actually have, was she actually unconscious? I know that's what she reported to her providers, but just because she reported it doesn't make it true. I think you misunderstood me. The bigger issue is we have someone who was not unwell, has this accident, and then whether or not there's neurological exams that are positive or not, we know there's not, but based upon the medical findings, you have someone who was previously relatively well and is now very unwell. And that seems to be what the doctor's findings were that the arbitrator relied upon. Right. But there's also findings that say she had a previous mental condition. And I guess we're arguing that her current mental health status is not related to the original work accident. And in one of the records, she even admits that there's stressors at homes and she's having family issues. So who's to say that that is not what is causing her current mental condition right now? Can we ask you this, let's assume that it's a combination of factors. Does the work injury have to be the sole or the only cause of the plaintiff's condition and well-being? What if it's a combination? Is it compensable then? Well, I think the fact is that the condition that she suffered from as a result of the 2011. And so for that, she would be compensated with the 10% man as a whole and the TTD through that time. What about this hypothetical? And that is, there's, I don't think it's just a hypothetical, but there's medical testimony that the accident triggered the findings that there were long-term effects. What does that do for your case? The triggering of a more substantial injury. Well, I think that's, I guess, a medical, two medical opinions against each other. Ultimately. And who decides the outcome when that occurs? You guys should. The commission in the first. No, I don't think we decided we, we see whether or not it's against the manifest way to the evidence. Yes. The decision that's made by the commission. That's true. So I guess to wrap things up again, I'm just going to restate that the plaintiff believes that the defendant did not suffer from the extent of the injuries that was awarded and her reward award should be adjusted to 10% person as a whole for her concussion, mild concussion and cervical strain, and then adjust the temporary total disability benefits through the date of accident through August 4th, 2011. Thank you. Thank you, Ms. Thomas. Thank you, Mr. Manchetti.